FILED
CLERK, U.S. DISTRICT COURT
1/10/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: JB DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 2:22-cr-00009-PA |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 1951(a): Interference with Commerce by Extortion; 18 U.S.C. § 2(a): Aiding and Abetting] |
| THOMAS H. PETERS, | |
| Defendant. | |

The United States Attorney charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

A. RELEVANT PERSONS AND ENTITIES

1. The Los Angeles Department of Water and Power ("LADWP") was the largest municipal utility in the United States, and provided water and electricity services to approximately 4 million residents in and around the City of Los Angeles (the "City"). LADWP was governed by a five-member Board of Commissioners (the "LADWP Board").

2. The Los Angeles City Attorney's Office ("City Attorney's Office") wrote every municipal law for the City, advised the Mayor, the City Council, and all City departments and commissions, defended

the City in litigation, brought forth lawsuits on behalf of the people of the City, and prosecuted misdemeanor crimes.

3. From on or about February 18, 2014, until on or about March 25, 2019, defendant THOMAS H. PETERS was the Chief of the Civil Litigation Branch of the City Attorney's Office.

4. Relevant attorneys and personnel in private practice included the following:

    a. Paul O. Paradis was an attorney licensed in New York.

    b. Paradis Law Partner was an attorney licensed in New York and the law partner of Paradis.

    c. Paul Kiesel ("Kiesel") was an attorney licensed in California. Kiesel owned and operated a law firm (the "Kiesel Law Firm") based in California that served clients both within and outside the State.

    d. From approximately 2005 until on or about July 7, 2017, Person A was employed by the Kiesel Law Firm.

    e. Ohio Attorney was an attorney licensed in Ohio.

B.  THE EXTORTION SCHEME

    **1.  The LADWP Billing Debacle**

5. In 2013, LADWP implemented a new billing system, which it had procured from an outside vendor, PricewaterhouseCoopers ("PwC"). After LADWP implemented the new billing system, hundreds of thousands of LADWP customers ("ratepayers") received inaccurate utility bills, which ranged from massively inflated bills to those that undercharged ratepayers to the financial detriment of LADWP.

6. By in or around December 2014, the City and LADWP were facing multiple class action lawsuits (collectively, the "class

2

action lawsuits") by ratepayers alleging various claims based on LADWP's faulty billing system.

7. The City Attorney's Office represented the City and LADWP in those class action lawsuits. The City Attorney's Office was also aided by attorneys from an outside law firm ("Class Action Counsel").

8. On or about December 16, 2014, members of the City Attorney's Office retained Paradis and Kiesel as Special Counsel to represent the City in a contemplated lawsuit against PwC.

9. Under the terms of the Special Counsel contract, Paradis and Kiesel would act as agents for the City and were to render their services on a contingency-fee basis, meaning that they would not be paid until and unless the City prevailed in its lawsuit against PwC, at which time they would jointly receive approximately 19.9% of damages awarded to the City. The terms of the Special Counsel contract specified that Paradis and Kiesel would bear all costs for the City's lawsuit against PwC, to be reimbursed only upon a successful result in the lawsuit.

10. The City's complaint alleged that PwC had caused hundreds of millions of dollars in damage. Paradis's and Kiesel's 19.9% share of such a recovery would have totaled tens of millions of dollars.

11. At the time that Paradis began representing the City as Special Counsel in or around December 2014, he also represented an LADWP ratepayer, Antwon Jones, who had a claim arising from LADWP billing overcharges. By in or around January 2015, members of the City Attorney's Office were aware that Paradis was simultaneously representing both the City and Jones.

12. In or around January and February of 2015, members of the City Attorney's Office pursued a strategy whereby Paradis and Kiesel

would represent both the City and Jones in parallel lawsuits against PwC (the "parallel litigation strategy"). The parallel litigation strategy also entailed convincing counsel for the plaintiffs in the existing class action lawsuits against the City to dismiss their claims and instead join the City in coordinated litigation against PwC.

13. By on or about February 23, 2015, the City Attorney's Office decided not to pursue the parallel litigation strategy.

### 2. The City's Affirmative Lawsuit Against PwC

14. On March 6, 2015, the City filed a civil lawsuit against PwC ("*City v. PwC*"), which generally alleged that PwC was responsible for LADWP's billing debacle. Paradis and Kiesel represented the City in that action for approximately four years, until on or about March 6, 2019.

15. Because Paradis and Kiesel were operating as agents for the City as Special Counsel, the City Attorney's Office had a legal and ethical responsibility to supervise the Special Counsel and to maintain ultimate control over the litigation of *City v. PwC*. Accordingly, the Special Counsel contract provided that the City Attorney's Office would "retain final authority over all material aspects" of dispute resolution and litigation. Defendant PETERS was responsible for supervising the *City v. PwC* matter from shortly after its filing until his resignation on or about March 25, 2019.

### 3. The Collusive Class Action Lawsuit

16. On April 1, 2015, Ohio Attorney filed the *Jones v. City* complaint, which Paradis had drafted.

17. During the spring of 2015, defendant PETERS was informed by a City Attorney's Office official senior to defendant PETERS ("City

Attorney Official") that the *Jones v. City* complaint was a friendly lawsuit intended as a vehicle for the City to settle globally and at minimal cost all claims related to the LADWP billing debacle, that Paradis had referred the case to Ohio Attorney for that purpose, and that City Attorney Official had directed and authorized this strategy before the complaint was filed.

18. On or about April 8, 2015, members of the City Attorney's Office met with Ohio Attorney to discuss settlement terms that would enable *Jones v. City* to be used as the vehicle to globally settle all of the LADWP billing claims against the City.

19. Between on or about June 11, 2015, and on or about July 31, 2015, Paradis and others on behalf of the City participated in four confidential mediation sessions with Ohio Attorney. Defendant PETERS attended at least a portion of one session. The other class action plaintiffs were excluded from these sessions. At the close of the final session, the mediator issued a proposal that would cap plaintiff attorneys' fees at $13,000,000.

20. On August 1, 2015, the City's Class Action Counsel sent an email to members of the City Attorney's Office detailing Class Action Counsel's many reasons for believing that the $13,000,000 attorney fee proposal was unjustifiably high. The enumerated reasons included that Ohio Attorney had done "little demonstrative work to advance the interests of the class."

21. Notwithstanding the numerous concerns that were raised by the City and disputed by no one, on or about August 20, 2015 — less than three weeks later — the City and Ohio Attorney filed a stipulated agreement that would provisionally resolve all claims

against the City related to the LADWP billing debacle and accept the $13,000,000 cap on plaintiff attorneys' fees.

22. On or about October 31, 2016, Paradis and others on behalf of the City attended another mediation session with Ohio Attorney. The parties agreed to revise the August 20, 2015 stipulated agreement, including by raising the cap on plaintiff attorneys' fees to approximately $19,000,000.

23. On or about July 20, 2017, the Los Angeles County Superior Court judge overseeing the class actions issued a final approval of an approximately $67,000,000 settlement agreement in *Jones v. City*. The settlement agreement also provided for approximately $19,000,000 in plaintiff attorneys' fees, approximately $10,300,000 of which was awarded to Ohio Attorney and his law firm.

**4.    Defendant PETERS Learns of Person A's Extortionate Demands**

24. On November 16, 2017, defendant PETERS learned from Paradis that Person A, a former employee of Kiesel, had stolen or improperly retained from Kiesel's law firm certain documents that would show the City's undisclosed collusion with Ohio Attorney in the *Jones v. City* lawsuit (the "Sensitive Documents"). Paradis informed defendant PETERS that Person A had threatened to reveal the Sensitive Documents if Kiesel did not pay her to return the Sensitive Documents. In addition, Paradis told defendant PETERS that Person A had alleged various employment-related claims against Kiesel, and that Person A had tied those claims to her threatened release of the documents. Defendant PETERS, who knew Person A from when he had previously worked at Kiesel's law firm, understood that Person A had demanded over a million dollars from Kiesel. Paradis specifically informed defendant PETERS that Person A had threatened to appear at the next

6

hearing in the *City v. PwC* case, which was scheduled for December 4, 2017. Defendant PETERS knew that at this hearing, the court was set to hear arguments on PwC's motion to compel the *Jones v. PwC* draft complaint, and he knew that this document would lead PwC to discover the undisclosed collusive origins of the *Jones v. City* case.

### 5. Defendant PETERS Orders Kiesel to Pay the Monetary Demands If Necessary or Potentially Be Fired as the City's Special Counsel

25. On November 17, 2017, defendant PETERS met with Kiesel, Paradis, and Paradis Law Partner and discussed Person A's threats and monetary demands. Kiesel complained that Person A's threats and demands constituted extortion and expressed reluctance to pay them. Defendant PETERS directed Kiesel to resolve the situation, including, if necessary, by paying Person A's demands, or else defendant PETERS would advocate for Kiesel and Paradis to be fired as the City's Special Counsel. Defendant PETERS did not have direct authority to fire Special Counsel.

26. If the City prevailed in its lawsuit against PwC and obtained the monetary damages it claimed, Kiesel and Paradis stood to recover tens of millions of dollars in attorney fees. By the time of the November 17, 2017 meeting, Kiesel and his law firm had invested thousands of hours of uncompensated labor into *City v. PwC*. Additionally, Kiesel had borne over $30,000 in non-labor costs on behalf of the City for *City v. PwC*.

27. Late in the afternoon on Friday, December 1, 2017, defendant PETERS met with other senior members of the City Attorney's Office and provided an update on the status of the Person A situation, including the fact that Kiesel had unsuccessfully

7

attempted to negotiate with Person A at LADWP headquarters, and Person A's threat to appear at the *City v. PwC* hearing the following Monday and reveal the Sensitive Documents.  Defendant PETERS stated that he did not know exactly what Person A was planning to do, but that he thought she might either give the Sensitive Documents to the court or to PwC's lead counsel, and that she might have arranged for press coverage.  Defendant PETERS conveyed that Kiesel had described Person A's threats as "extortion."  Because he understood from senior leadership at the City Attorney's Office that they wanted the matter resolved quietly and the Sensitive Documents returned, defendant PETERS advised that he would take care of the situation and that he would personally attend the *City v. PwC* hearing the following Monday.

28.  On December 1, 2017, after the meeting, defendant PETERS sent a text message to Paradis relaying that senior leadership at the City Attorney's Office was "not firing anyone at this point" —— meaning that no decision had been made at the meeting to seek termination of the Special Counsel contract in light of the extortion situation —— but warning that senior leadership was concerned about "the prospect of a sideshow" with respect to Person A's threat to appear in court the following Monday and reveal the Sensitive Documents.

**6.    Person A Appears in Court With the Sensitive Documents**

29.  On the afternoon of December 4, 2017, defendant PETERS, Paradis, Kiesel, and Paradis Law Partner, among others, attended the scheduled hearing in *City v. PwC*.  At Kiesel's request, his friend ("Kiesel's Friend"), who was friendly with Person A, also attended the hearing to intervene with Person A if necessary.

30.  Person A appeared at the December 4, 2017 hearing and attempted to give documents to a court employee, who advised Person A that the court would not accept documents from a non-party.  Person A approached the lead counsel for PwC with the documents, stating that she had information that could help PwC's case.  PwC's counsel exchanged business cards with Person A and asked her to call him.  Defendant PETERS and Kiesel understood that by these actions, Person A was conveying to Kiesel and others acting on behalf of the City that she would fulfill her threat to reveal the Sensitive Documents showing the City's collusion unless Kiesel satisfied her monetary demands.

    **7.    Facing Defendant PETERS's Threat of Termination, Kiesel Pays Person A's Extortionate Demands**

31.  After Person A attempted to provide the Sensitive Documents to the court and spoke with PwC's counsel to advise that she had information that would be helpful to PwC's case, Kiesel's Friend approached Person A and asked to recommence negotiation of her monetary demands to Kiesel.  Kiesel's Friend did so at the direction of Kiesel, who understood from defendant PETERS that if he did not pay Person A's extortionate demands, defendant PETERS would advocate to have Kiesel fired from his potentially lucrative role as the City's Special Counsel.

32.  At approximately 3:06 p.m. on December 4, 2017, shortly after the hearing ended, defendant PETERS sent a series of text messages to Kiesel relaying defendant PETERS's observations that Person A had approached PwC's counsel and given him her card, and that she had "tried to file a bunch of docs."

33. At approximately 3:40 p.m. on December 4, 2017, in another series of text messages, defendant PETERS again directed Kiesel to do what it took to get the Sensitive Documents back, stating, "I need you to take care of this." Kiesel and defendant PETERS arranged via text message to meet in defendant PETERS's office.

34. At approximately 4:00 p.m. on December 4, 2017, defendant PETERS, Kiesel, Paradis, and Paradis Law Partner met in defendant PETERS's office. Defendant PETERS reiterated that Kiesel needed to pay Person A's monetary demands in order to obtain the return of the Sensitive Documents, or he would be fired, which would mean significant financial losses to Kiesel and his firm.

35. At approximately 6:09 p.m. on December 4, 2017, Kiesel sent a text message to defendant PETERS, stating, "I am meeting [Person A] tonight at 7:30 PM. With [Kiesel's Friend]. Will get this done."

36. On the evening of December 4, 2017, Person A, Kiesel, and Kiesel's Friend met at a restaurant and further discussed Person A's demands. At the dinner, Kiesel agreed to pay $800,000 to Person A to prevent her from releasing the Sensitive Documents.

37. At approximately 9:15 p.m. on December 4, 2017, Kiesel informed defendant PETERS via text message of the terms of the agreement reached with Person A, including that Kiesel would pay Person A $800,000 and that Person A would return the Sensitive Documents to Kiesel.

38. At approximately 11:43 p.m. on December 4, 2017, defendant PETERS replied to Kiesel, stating, "Good job," and directing Kiesel to ensure that there was a strong confidentiality agreement with Person A regarding the $800,000 payment and the Sensitive Documents.

**8. Defendant PETERS Continues to Conceal Person A's Extortion of Kiesel in 2019**

39. Beginning on or about May 1, 2019, pursuant to a court order, defendant PETERS testified in a civil deposition in *City v. PwC* on a variety of topics, including collusion by the City in *Jones v. City*. By that time, defendant PETERS was no longer employed by the City Attorney's Office, and he was represented at the deposition by a personal attorney.

40. On or about May 6, 2019, the City Attorney's Office inquired of defendant PETERS (through respective counsel) what defendant PETERS recalled about a dispute that Kiesel had negotiated at LADWP headquarters in 2017. Defendant PETERS understood that the inquiry about this long-ago "settlement" related to Kiesel's payment of Person A's extortionate demands to conceal the City's collusion. Defendant PETERS further understood that the inquiry was intended to determine whether defendant PETERS would reveal, if asked by someone outside the City, the extortion scheme or the underlying collusion that was concealed by the extortion scheme.

41. In order to convey that he would continue to conceal his knowledge of Person A's extortion of Kiesel and defendant PETERS's own involvement in it, defendant PETERS falsely and misleadingly replied to the City through his personal attorney that the dispute had only involved an employment claim by Person A. Defendant PETERS intentionally omitted: (1) that Person A had threatened to reveal the Sensitive Documents exposing the undisclosed collusion unless Kiesel satisfied her demands, which Kiesel had ultimately done by paying Person A $800,000 to obtain the return of the Sensitive Documents; (2) that defendant PETERS had directed Kiesel to satisfy Person A's

monetary demands or be fired from Kiesel's role as Special Counsel; and (3) that defendant PETERS had discussed the situation with and received direction from senior members of the City Attorney's Office.

42.  These Introductory Allegations are incorporated into the sole count of this Information.

COUNT ONE

[18 U.S.C. §§ 1951(a), 2(a)]

Between on or about November 16, 2017, and on or about December 4, 2017, in Los Angeles County, within the Central District of California, defendant THOMAS H. PETERS, aiding and abetting Person A, and knowingly and with the intent to obtain property for Person A, affected interstate commerce and the movement of articles and commodities in interstate commerce, by extortion, that is, defendant PETERS knowingly and willfully directed victim Paul Kiesel to transfer the property of victim Kiesel to Person A, with victim Kiesel's consent, induced by the wrongful use of fear, by threatening to advocate to terminate victim Kiesel as Special Counsel for the City if he did not agree to Person A's extortionate demands, thereby putting victim Kiesel in fear of economic loss and reputational harm.

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption and Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption and Civil Rights Section

MELISSA MILLS
J. JAMARI BUXTON
SUSAN S. HAR
Assistant United States Attorneys
Public Corruption and Civil Rights Section