TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MELISSA MILLS (Cal. Bar No. 248529)
J. JAMARI BUXTON (Cal. Bar No. pending)
SUSAN S. HAR (Cal. Bar No. 301924)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-0627
     Facsimile:  (213) 894-7631
     E-mail:     Melissa.Mills@usdoj.gov
                 Jamari.Buxton@usdoj.gov
                 Susan.Har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

```
FILED
CLERK, U.S. DISTRICT COURT

1/10/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR  2:22-cr-00009-PA |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT THOMAS H. PETERS |
| v. | |
| THOMAS H. PETERS, | |
| Defendant. | |

1.    This constitutes the plea agreement between THOMAS H. PETERS ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.    Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a one-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Aiding and Abetting Interference with Commerce By Extortion, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2.

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

3.   Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation ("FBI"), and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, regulatory, or licensing authority, including the Bar of any state.  This cooperation requires defendant to:

      a.   Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

      b.   Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

      c.   Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO, or its designee, inquires.

      d.   If requested to do so by the USAO, act in an undercover capacity to the best of defendant's ability in connection with criminal investigations by federal, state, local, or foreign law enforcement authorities, in accordance with the express instructions of those law enforcement authorities.  Defendant agrees not to act in an undercover capacity, tape record any conversations, or gather any evidence except after a request by the USAO and in accordance with express instructions of federal, state, local, or foreign law enforcement authorities.

4.   For purposes of this agreement: (1) "Cooperation Information" shall mean any statements made, or documents, records, tangible evidence, or other information provided, by defendant pursuant to defendant's cooperation under this agreement or pursuant to the letter agreement previously entered into by the parties dated January 28, 2020 (the "Letter Agreement"); and (2) "Plea Information" shall mean any statements made by defendant, under oath, at the guilty plea hearing and the agreed to factual basis statement in this agreement.

3

1                    THE USAO'S OBLIGATIONS

2        5.    The USAO agrees to:

3             a.    Not contest facts agreed to in this agreement.

4             b.    Abide by all agreements regarding sentencing contained

5    in this agreement.

6             c.    Except for criminal tax violations (including

7    conspiracy to commit such violations chargeable under 18 U.S.C.

8    § 371), not further criminally prosecute defendant for conduct

9    described in the agreed-to factual basis set forth in Attachment A.

10   Defendant understands that the USAO is free to criminally prosecute

11   defendant for any other unlawful past conduct or any unlawful conduct

12   that occurs after the date of this agreement.  Defendant agrees that

13   at the time of sentencing the Court may consider the uncharged

14   conduct in determining the applicable Sentencing Guidelines range,

15   the propriety and extent of any departure from that range, and the

16   sentence to be imposed after consideration of the Sentencing

17   Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

18            d.    At the time of sentencing, provided that defendant

19   demonstrates an acceptance of responsibility for the offense conduct,

20   up to and including the time of sentencing, recommend a two-level

21   reduction in the applicable Sentencing Guidelines offense level,

22   pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move

23   for an additional one-level reduction if available under that

24   section.

25       6.    The USAO further agrees:

26            a.    Not to offer as evidence in its case-in-chief in the

27   above-captioned case or any other criminal prosecution that may be

28   brought against defendant by the USAO, or in connection with any

                                   4

sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b.   Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed.  Defendant understands, however, that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c.   In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d.   If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law

enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a sentence at the low end of or below this reduced range.

<u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

7. Defendant understands the following:

a. Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b. Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c. Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d. At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance. The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the USAO.

e. The USAO's determination whether defendant has provided substantial assistance will not depend in any way on whether

the government prevails at any trial or court hearing in which

defendant testifies or in which the government otherwise presents

information resulting from defendant's cooperation.

<u>NATURE OF THE OFFENSE</u>

8.   Defendant understands that for defendant to be guilty of the crime charged in the sole count of the Information, namely, aiding and abetting Interference with Commerce by Extortion ("extortion"), in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2, the following must be true:

a.   Person A committed extortion;

b.   The defendant aided, counseled, commanded, induced, or procured Person A with respect to at least one element of extortion;

c.   The defendant acted with the intent to facilitate extortion; and

d.   The defendant acted before the crime was committed.

9.   Defendant understands that for Person A to be guilty of extortion, the following must be true:

a.   Person A induced victim Paul Kiesel to part with property by wrongful threat of economic harm or reputational harm;

b.   Person A acted with the intent to obtain the property; and

c.   Commerce from one state to another was or would have been affected in some way.

<u>PENALTIES</u>

10.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Sections 1951(a) and 2, is: 20 years' imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross

gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

11.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

12.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

13.   Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial

1  of admission to the United States in the future.  The Court cannot,

2  and defendant's attorney also may not be able to, advise defendant

3  fully regarding the immigration consequences of the felony conviction

4  in this case.  Defendant understands that unexpected immigration

5  consequences will not serve as grounds to withdraw defendant's guilty

6  plea.

7                              FACTUAL BASIS

8       14.  Defendant admits that defendant is, in fact, guilty of the

9  offense to which defendant is agreeing to plead guilty.  Defendant

10  and the USAO agree to the statement of facts attached to this

11  agreement as Attachment A and agree that this statement of facts is

12  sufficient to support a plea of guilty to the charge described in

13  this agreement and to establish the Sentencing Guidelines factors set

14  forth in paragraph 16 below but is not meant to be a complete

15  recitation of all facts relevant to the underlying criminal conduct

16  or all facts known to either party that relate to that conduct.

17                            SENTENCING FACTORS

18       15.  Defendant understands that in determining defendant's

19  sentence the Court is required to calculate the applicable Sentencing

20  Guidelines range and to consider that range, possible departures

21  under the Sentencing Guidelines, and the other sentencing factors set

22  forth in 18 U.S.C. § 3553(a).  Defendant understands that the

23  Sentencing Guidelines are advisory only, that defendant cannot have

24  any expectation of receiving a sentence within the calculated

25  Sentencing Guidelines range, and that after considering the

26  Sentencing Guidelines and the other § 3553(a) factors, the Court will

27  be free to exercise its discretion to impose any sentence it finds

28

appropriate up to the maximum set by statute for the crime of conviction.

16.   Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 9 | U.S.S.G. § 2B3.3 |
| Amount obtained exceeded $550,000: | +14 | U.S.S.G. § 2B1.1(b)(H) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

17.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

18.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

19.   Defendant understands that by pleading guilty, defendant gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.   The right to be represented by counsel – and if necessary have the Court appoint counsel - at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

     d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

     e.   The right to confront and cross-examine witnesses against defendant.

     f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

     g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

     h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

20.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

21.  Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction of no more than 33 months, defendant gives up the right to appeal all of the following:

(a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

22.   The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above, the USAO gives up its right to appeal any portion of the sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

23.   Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States

Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible; and (c) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## RESULT OF VACATUR, REVERSAL OR SET-ASIDE

24. Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

## EFFECTIVE DATE OF AGREEMENT

25. This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

## BREACH OF AGREEMENT

26. Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached. For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely

accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.   If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b.   The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated not to criminally prosecute pursuant to this agreement; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, regulatory, or licensing action.

c.   The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d.   In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

27.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

15

1      COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

2                        OFFICE NOT PARTIES

3      28.  Defendant understands that the Court and the United States

4  Probation and Pretrial Services Office are not parties to this

5  agreement and need not accept any of the USAO's sentencing

6  recommendations or the parties' agreements to facts or sentencing

7  factors.

8      29.  Defendant understands that both defendant and the USAO are

9  free to: (a) supplement the facts by supplying relevant information

10  to the United States Probation and Pretrial Services Office and the

11  Court, (b) correct any and all factual misstatements relating to the

12  Court's Sentencing Guidelines calculations and determination of

13  sentence, and (c) argue on appeal and collateral review that the

14  Court's Sentencing Guidelines calculations and the sentence it

15  chooses to impose are not error, although each party agrees to

16  maintain its view that the calculations in paragraph 16 are

17  consistent with the facts of this case.  While this paragraph permits

18  both the USAO and defendant to submit full and complete factual

19  information to the United States Probation and Pretrial Services

20  Office and the Court, even if that factual information may be viewed

21  as inconsistent with the facts agreed to in this agreement, this

22  paragraph does not affect defendant's and the USAO's obligations not

23  to contest the facts agreed to in this agreement.

24      30.  Defendant understands that even if the Court ignores any

25  sentencing recommendation, finds facts or reaches conclusions

26  different from those agreed to, and/or imposes any sentence up to the

27  maximum established by statute, defendant cannot, for that reason,

28  withdraw defendant's guilty plea, and defendant will remain bound to

fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

31.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

///

///

///

1

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

2     32.   The parties agree that this agreement will be considered

3  part of the record of defendant's guilty plea hearing as if the

4  entire agreement had been read into the record of the proceeding.

5   AGREED AND ACCEPTED

6   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
7   CALIFORNIA

8   TRACY L. WILKISON
    United States Attorney

9

10  _____        _____
    MELISSA MILLS                          Date
11  SUSAN S. HAR
    J. JAMARI BUXTON
12  Assistant United States Attorneys

13
    _____        _____
14  THOMAS H. PETERS                       Date
    Defendant
15

16  _____        _____
    JEFFREY RUTHERFORD                     Date
17  Attorney for Defendant
    THOMAS H. PETERS

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATION OF DEFENDANT</u>

2      I have read this agreement in its entirety.  I have had enough

3  time to review and consider this agreement, and I have carefully and

4  thoroughly discussed every part of it with my attorney.  I understand

5  the terms of this agreement, and I voluntarily agree to those terms.

6  I have discussed the evidence with my attorney, and my attorney has

7  advised me of my rights, of possible pretrial motions that might be

8  filed, of possible defenses that might be asserted either prior to or

9  at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10 of relevant Sentencing Guidelines provisions, and of the consequences

11 of entering into this agreement.  No promises, inducements, or

12 representations of any kind have been made to me other than those

13 contained in this agreement.  No one has threatened or forced me in

14 any way to enter into this agreement.  I am satisfied with the

15 representation of my attorney in this matter, and I am pleading

16 guilty because I am guilty of the charge and wish to take advantage

17 of the promises set forth in this agreement, and not for any other

18 reason.

19

20 _____        _____
   THOMAS H. PETERS                       Date
   Defendant

21

22 //

23 //

24 //

25 //

26 //

27 //

28

1

<u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

2     I am THOMAS H. PETERS's attorney.  I have carefully and

3 thoroughly discussed every part of this agreement with my client.

4 Further, I have fully advised my client of his rights, of possible

5 pretrial motions that might be filed, of possible defenses that might

6 be asserted either prior to or at trial, of the sentencing factors

7 set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8 provisions, and of the consequences of entering into this agreement.

9 To my knowledge: no promises, inducements, or representations of any

10 kind have been made to my client other than those contained in this

11 agreement; no one has threatened or forced my client in any way to

12 enter into this agreement; my client's decision to enter into this

13 agreement is an informed and voluntary one; and the factual basis set

14 forth in this agreement is sufficient to support my client's entry of

15 a guilty plea pursuant to this agreement.

16

17 _____          _____
   JEFFREY RUTHERFORD                        Date
18 Attorney for Defendant
   THOMAS H. PETERS

19

20

21

22

23

24

25

26

27

28

1   PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2       32.   The parties agree that this agreement will be considered

3   part of the record of defendant's guilty plea hearing as if the

4   entire agreement had been read into the record of the proceeding.

5   AGREED AND ACCEPTED

6   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
7   CALIFORNIA

8   TRACY L. WILKISON
    United States Attorney

9

10                                          01-03-2022

11  _____          _____
    MELISSA MILLS                           Date
    SUSAN S. HAR
12  J. JAMARI BUXTON
    Assistant United States Attorneys

13  _____          11·24·21
                                            _____
14  THOMAS H. PETERS                        Date
    Defendant
                                            11/24/2021
15  _____          _____
16  JEFFREY RUTHERFORD                      Date
    Attorney for Defendant
17  THOMAS H. PETERS

18

19

20

21

22

23

24

25

26

27

28

                              18

1                    CERTIFICATION OF DEFENDANT

2       I have read this agreement in its entirety.  I have had enough

3  time to review and consider this agreement, and I have carefully and

4  thoroughly discussed every part of it with my attorney.  I understand

5  the terms of this agreement, and I voluntarily agree to those terms.

6  I have discussed the evidence with my attorney, and my attorney has

7  advised me of my rights, of possible pretrial motions that might be

8  filed, of possible defenses that might be asserted either prior to or

9  at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10  of relevant Sentencing Guidelines provisions, and of the consequences

11  of entering into this agreement.  No promises, inducements, or

12  representations of any kind have been made to me other than those

13  contained in this agreement.  No one has threatened or forced me in

14  any way to enter into this agreement.  I am satisfied with the

15  representation of my attorney in this matter, and I am pleading

16  guilty because I am guilty of the charge and wish to take advantage

17  of the promises set forth in this agreement, and not for any other

18  reason.

19

20  _____          _____
    THOMAS H. PETERS                     Date
21  Defendant

22  //

23  //

24  //

25  //

26  //

27  //

28

<u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

I am THOMAS H. PETERS's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____          11 / 24 / 2021
JEFFREY RUTHERFORD                      Date
Attorney for Defendant
THOMAS H. PETERS

20

Attachment A

**ATTACHMENT A**

FACTUAL BASIS

I.   **THE COLLUSIVE LITIGATION**

   A.   **BACKGROUND ON THE LADWP BILLING LITIGATION**

   1.   From on or about February 18, 2014, until on or about March 25, 2019, defendant THOMAS H. PETERS was the Chief of the Civil Litigation Branch of the Los Angeles City Attorney's Office (the "City Attorney's Office").  In that role, defendant PETERS was responsible for supervising all civil litigation matters handled by the Civil Litigation Branch of the City Attorney's Office.

   2.   In 2013, the Los Angeles Department of Water and Power ("LADWP"), a proprietary department of the City of Los Angeles (the "City"), implemented a new billing system, which it had procured from an outside vendor, PricewaterhouseCoopers ("PwC").  After LADWP implemented the new billing system, hundreds of thousands of LADWP ratepayers received inaccurate utility bills, which ranged from massively inflated bills to those that undercharged ratepayers to the financial detriment of LADWP.

   3.   By in or around December 2014, the City and LADWP were facing multiple class action lawsuits by ratepayers alleging various claims based on LADWP's faulty billing system.  The City Attorney's Office represented the City and LADWP in those class action lawsuits. The City Attorney's Office was also aided in the defense of those class actions by attorneys from an outside law firm ("Class Action Counsel").

   4.   On December 16, 2014, defendant PETERS and another senior member of the City Attorney's Office ("City Attorney Official") met with two outside attorneys, Paul Paradis and Paul Kiesel.  Kiesel was

Defendant's Initials: _TH_          1

defendant PETERS's former law partner, and Paradis was a New York attorney whom Kiesel knew.  Paradis and Kiesel were requesting the City's help with a potential lawsuit that they intended to bring on behalf of Paradis's client, an LADWP ratepayer named Antwon Jones, against PwC.  At this meeting, City Attorney Official asked Paradis and Kiesel to represent the City as Special Counsel in an affirmative lawsuit against PwC, and they agreed.

5.   In January and February 2015, the City Attorney's Office, along with Paradis and Kiesel, pursued a strategy whereby Paradis and Kiesel would represent both the City and Jones in parallel lawsuits against PwC (the "parallel litigation strategy").  In furtherance of the parallel litigation strategy, in January of 2015, Paradis drafted a complaint, styled *Antwon Jones v. PwC*, and circulated it among members of the City Attorney's Office for their review and feedback. The City's parallel litigation strategy also entailed convincing counsel for the plaintiffs in the existing class action lawsuits already pending against the City to toll and dismiss their claims and join the City and Jones in coordinated litigation against PwC.

6.   Because the LADWP billing debacle and the resulting class action lawsuits had generated substantial negative publicity for the City and LADWP, defendant PETERS and others in the City Attorney's Office saw the prospect of getting the existing lawsuits dismissed and teaming up with the ratepayers against PwC as a way to cast the City and LADWP in a more favorable light.  Defendant PETERS also knew that City leaders were displeased with the negative publicity surrounding the billing debacle and the attendant litigation, and defendant PETERS understood that tolling and dismissing the existing

Defendant's Initials: ⟨signature⟩          2

1  lawsuits against the City while putting the City on the offensive

2  against PwC would enhance his reputation and professional prospects.

3      7.    After the City's Class Action Counsel distributed, on

4  February 17, 2015, a memo advising against the parallel litigation

5  strategy for a variety of ethical and practical reasons, the City

6  Attorney's Office decided to abandon the strategy.

7      B.  **THE CITY DIRECTS PARADIS AND KIESEL TO FIND COUNSEL FOR A**
        **FRIENDLY LAWSUIT AGAINST THE CITY, AND TO SUE PWC ON BEHALF**
8       **OF THE CITY**

9      8.    During the spring of 2015, defendant PETERS learned the

10  following information from City Attorney Official:

11      a.    In late February or early March 2015, City Attorney

12  Official discussed with Paradis and Kiesel how to proceed in lieu of

13  the abandoned parallel litigation strategy, and particularly how to

14  continue shifting the spotlight away from LADWP's problems and toward

15  PwC as the cause of those problems.  Paradis proposed that he and

16  Kiesel could find outside counsel that would be friendly to the City

17  and its litigation goals to file a class action lawsuit against the

18  City with Jones as the class representative.  City Attorney Official

19  authorized and directed Paradis and Kiesel to pursue that strategy.

20  This was sometimes referred to as the "white-knight" approach,

21  reflecting the understanding that the white-knight plaintiff would

22  not be truly adverse to the City but would save the City from a long

23  and costly battle over the existing LADWP-billing-related claims by

24  serving as a vehicle for the City to settle all of those claims on

25  the City's desired terms.

26      b.    After the white-knight approach was authorized,

27  Paradis recruited an Ohio attorney ("Ohio Attorney"), and Kiesel

28  recruited a California attorney to jointly function with Ohio

Defendant's Initials: ꞮꝒ        3

1   Attorney as Jones's counsel of record in the friendly class action
2   lawsuit against the City.

3        9.   On March 6, 2015, the City filed a civil lawsuit against
4   PwC ("*City v. PwC*"), which generally alleged that PwC was responsible
5   for LADWP's billing debacle.  That same day, the City Attorney held a
6   press conference and alleged that PwC had caused the City to sustain
7   "perhaps hundreds of millions of dollars" in damages.

8        10.  Paradis and Kiesel represented the City in *City v. PwC* for
9   approximately four years before resigning at the City's request on
10  March 6, 2019.

11       11.  At some point after the *City v. PwC* complaint was filed,
12  defendant PETERS became directly responsible for overseeing that
13  matter.

14       **C.   THE CITY QUICKLY SETTLES WITH OHIO ATTORNEY TO RESOLVE ALL**
15           **LADWP BILLING CLAIMS**

16       12.  On April 1, 2015, Ohio Attorney caused the filing of the
17  *Jones v. City* complaint in Los Angeles Superior Court, as expected by
18  members of the City Attorney's Office.  Within two days of the
19  filing, members of the City Attorney's Office began communicating
20  with Ohio Attorney about a potential settlement, and the City quickly
21  began working towards a global settlement of all claims related to
22  the LADWP billing debacle with *Jones v. City* as the settlement
23  vehicle.

24       13.  During the summer of 2015, Paradis and others on behalf of
25  the City participated in multiple confidential mediation sessions
26  with Ohio Attorney.  Defendant PETERS attended at least a portion of
27  one such session on behalf of the City.  The other class action
28  plaintiffs were excluded from these sessions.  Following mediation,

Defendant's Initials: _____        4

1  the mediator issued a proposal that would cap plaintiff attorneys'
2  fees at $13,000,000. The City's Class Action Counsel raised concerns
3  to the City that the $13,000,000 proposed attorney-fee cap was
4  unjustifiably high, particularly because Ohio Attorney had done
5  "little demonstrative work to advance the interests of the class."
6  Defendant PETERS, among others at the City Attorney's Office,
7  believed that Ohio Attorney's contributions to the case had been too
8  minimal to justify the significant fee proposal, including because
9  Ohio Attorney had been involved only for a short time and had filed
10  no motions and propounded no discovery. Nonetheless, on August 20,
11  2015, the City and Ohio Attorney filed a stipulated agreement that
12  would provisionally resolve all claims against the City related to
13  the LADWP billing debacle and cap plaintiff attorneys' fees at
14  $13,000,000. In the fall of 2016, the City agreed to raise the cap
15  on plaintiff attorneys' fees to approximately $19,000,000.

16      14.  On July 20, 2017, the Los Angeles County Superior Court
17  judge overseeing the class actions issued a final approval of an
18  approximately $67,000,000 settlement agreement in *Jones v. City*. The
19  settlement agreement also provided for approximately $19,000,000 in
20  plaintiff attorneys' fees, approximately $10,300,000 of which was
21  awarded to Ohio Attorney and his law firm.

22      15.  In early 2017, PwC learned of the existence of the draft
23  *Jones v. PwC* complaint that Paradis had prepared at the City's
24  direction and sought an order from the court compelling the City to
25  produce it. Defendant PETERS, among others on behalf of the City,
26  was aware that production of the *Jones v. PwC* draft complaint would
27  reveal the undisclosed collusive origins of the *Jones v. City* case.
28  For that reason, defendant PETERS and others on behalf of the City

Defendant's Initials: _____          5

vigorously fought against producing this document to PwC.   After

months of increasingly contentious litigation, in the fall of 2017,

the court set a hearing on PwC's motion to compel production of the

document for December 4, 2017.

II.   **THE EXTORTION SCHEME**

    A.   **DEFENDANT PETERS LEARNS THAT PERSON A THREATENED TO REVEAL THE CITY'S COLLUSION UNLESS KIESEL PAID HER**

    16.   On or about November 16, 2017, defendant PETERS was

informed by Paradis that a recently terminated employee of Kiesel

("Person A") had stolen or improperly retained from Kiesel's law firm

certain documents that would show the City's undisclosed collusion

with Ohio Attorney in the *Jones v. City* lawsuit (the "Sensitive

Documents").   Paradis further informed defendant PETERS that Person A

had threatened to reveal the Sensitive Documents if Kiesel did not

pay her to return the Sensitive Documents.   In addition, Paradis told

defendant PETERS that Person A had alleged various employment-related

claims against Kiesel, and that Person A had tied those claims to her

threatened release of the documents.   Defendant PETERS, who knew

Person A from when he had previously worked at Kiesel's law firm,

understood that Person A had demanded over a million dollars from

Kiesel.   Paradis specifically informed defendant PETERS that Person A

had threatened to appear at the next hearing in the *City v. PwC* case,

which was scheduled for December 4, 2017.   Defendant PETERS knew that

at this hearing, the court was set to hear arguments on PwC's motion

to compel the *Jones v. PwC* draft complaint.

    17.   Defendant PETERS feared that if Person A carried out her

threat to publicly reveal that the City's $67,000,000 settlement with

Ohio Attorney was the result of undisclosed collusion, rather than

Defendant's Initials: _____   6

the arms-length adversarial proceeding that it purported to be, the City's litigation position in the related *City v. PwC* case would be seriously compromised, and the recently finalized *Jones v. City* settlement would also be jeopardized.  In addition, defendant PETERS knew that public disclosure of the information that Person A threatened to reveal would be highly damaging to the reputation of the City Attorney's Office.

**B.   DEFENDANT PETERS DIRECTS KIESEL TO SATISFY PERSON A'S MONETARY DEMANDS IF NECESSARY**

18.   On November 17, 2017, defendant PETERS met with Kiesel and Paradis and discussed Person A's threats and monetary demands. Kiesel complained that Person A's threats and demands constituted "extortion," and Kiesel expressed reluctance to pay the sum that Person A demanded.  Defendant PETERS expressed anger at Kiesel for not telling him about the situation earlier and advised that he and others at the City Attorney's Office needed to know about problems of this magnitude that could impact the reputation of the City Attorney's Office, imperil the *Jones v. City* settlement, and jeopardize the City's expected success in *City v. PwC*.  Defendant PETERS directed Kiesel to resolve the situation — including, if necessary, by satisfying Person A's monetary demands and getting the documents back — or else defendant PETERS would advocate to have Kiesel fired as the City's Special Counsel.  Defendant PETERS did not have direct authority to fire Kiesel or Paradis.

19.   On November 29, 2017, defendant PETERS met with Kiesel again.  Kiesel expressed that he was worried about being fired from the Special Counsel job because of Person A's threats and demands. Kiesel described his prior efforts to negotiate with Person A,

Defendant's Initials: _____        7

1  including a failed "mediation" at the LADWP cafeteria wherein Person
2  A had lowered her demand to $900,000 and Kiesel had counteroffered
3  $60,000.  Defendant PETERS told Kiesel that Kiesel would not be fired
4  at that time.  However, defendant PETERS reiterated that Kiesel
5  needed to take care of the Person A problem, by which defendant
6  PETERS meant that Kiesel needed to get the Sensitive Documents back
7  even if that required Kiesel to pay her monetary demand.

8       20.  Late in the afternoon on Friday, December 1, 2017,
9  defendant PETERS met with other senior members of the City Attorney's
10 Office and provided an update on the status of the Person A
11 situation, including her threat to appear at the *City v. PwC* hearing
12 the following Monday and reveal the Sensitive Documents.  Defendant
13 PETERS stated that he did not know exactly what Person A was planning
14 to do, but that he thought she might either give the Sensitive
15 Documents to the court or to PwC's lead counsel, and that she might
16 have arranged for press coverage.  Defendant PETERS conveyed that
17 Kiesel had described Person A's threats as "extortion."  Defendant
18 PETERS was directed to take care of the situation, and he stated that
19 he would do so.  Defendant PETERS further advised that he would
20 personally attend the *City v. PwC* hearing the following Monday.
21 Defendant PETERS feared that if Person A made good on her threats to
22 reveal the Sensitive Documents, he would be personally blamed for the
23 fallout and would lose his Branch Chief position and future
24 employment prospects.

25      21.  On December 1, 2017, after the meeting, defendant PETERS
26 sent a text message to Paradis relaying that senior leadership at the
27 City Attorney's Office was "not firing anyone at this point" ——
28 meaning that a decision to seek termination of the Special Counsel

Defendant's Initials: ⟍⟍⟋        8

1    contract had not been made at the meeting — but warning that others

2    were concerned about "the prospect of a sideshow" with respect to

3    Person A's threat to appear in court the following Monday and reveal

4    the Sensitive Documents.

5         **C.   PERSON A APPEARS IN COURT WITH THE SENSITIVE DOCUMENTS**

6         22.   On the afternoon of December 4, 2017, defendant PETERS

7    attended the scheduled hearing in *City v. PwC*.  Paradis, Kiesel, and

8    Paradis's law partner also attended on the City's behalf.  Kiesel had

9    also arranged for two colleagues, who were friendly with Person A and

10   whom defendant PETERS also knew, to attend in the event Kiesel needed

11   their help intervening with Person A.

12        23.   During the hearing, defendant PETERS saw and recognized

13   Person A in the courtroom.  Defendant PETERS watched Person A attempt

14   to give documents to a court employee, who did not accept them.

15   Defendant PETERS then watched Person A approach PwC's lead attorney

16   with documents and exchange business cards with him.  Defendant

17   PETERS understood that by these actions, Person A was conveying that

18   she would fulfill her threat to reveal the Sensitive Documents

19   showing the City's collusion unless Kiesel satisfied her monetary

20   demands.

21        **D.   DEFENDANT PETERS AGAIN DEMANDS THAT KIESEL SATISFY PERSON
          A'S MONETARY DEMANDS OR BE FIRED**

22

23        24.   After the hearing, defendant PETERS sent a series of text

     messages to Kiesel relaying defendant PETERS's observations of Person

24   A's actions in court.  In the text exchange, defendant PETERS stated,

25   "I need you to take care of this," by which he meant that Kiesel

26   needed to satisfy Person A's demands in order to obtain the return of

27

28

Defendant's Initials: ⩘                9

the Sensitive Documents.  Defendant PETERS and Kiesel then arranged
via text message to meet in defendant PETERS's office.

25.  Around 4:00 p.m. on December 4, 2017, defendant PETERS,
Kiesel, Paradis, and Paradis's law partner met in defendant PETERS's
office.  Defendant PETERS reiterated that Kiesel needed to satisfy
Person A's demands in order to obtain the return of the Sensitive
Documents, or he would be fired.  Kiesel acknowledged that the
situation was now very serious and that he would be terminated if he
did not comply, and he told defendant PETERS that he would reinitiate
negotiations with Person A and "get this done."  Kiesel then left the
meeting.

26.  After Kiesel left, Paradis remained in defendant PETERS's
office.  Paradis commented to defendant PETERS, "Maybe [Ohio
Attorney] should kick in."  Defendant PETERS understood this to
convey Paradis's belief that Ohio Attorney should contribute to
Kiesel's extortion payment to Person A, because Ohio Attorney would
also financially benefit from keeping the collusion concealed and the
settlement intact.

27.  Shortly thereafter, defendant PETERS received a text
message from Kiesel advising that he had arranged to meet Person A
that evening and that he intended to "get this done."

28.  Later that evening, defendant PETERS engaged in a text
exchange with Kiesel, wherein Kiesel informed defendant PETERS that
Kiesel had agreed to pay Person A $800,000, and that Person A would
return the Sensitive Documents.  Defendant PETERS replied, "Good
job," and he directed Kiesel to ensure that there was a strong
confidentiality agreement with Person A regarding the $800,000
payment and return of the Sensitive Documents.

Defendant's Initials: _____          10

29.  By the conduct described herein, Person A committed extortion.  By his threats that Kiesel's Special Counsel contract would most likely be terminated if Kiesel did not obtain the return of the Sensitive Documents, which defendant PETERS knew would require Kiesel to satisfy Person A's monetary demands, defendant PETERS aided and abetted Person A's extortion before it was completed.  Defendant PETERS induced Kiesel to part with property by wrongful threat of economic or reputational harm, and he did so with the intent to obtain Kiesel's property for Person A and to facilitate Person A's extortion.  Kiesel had a national law practice that could have been impacted by the loss of his Special Counsel contract and the release of the Sensitive Documents.  Accordingly, defendant PETERS's and Person A's conduct affected or could have affected interstate commerce.

30.  Defendant PETERS knew that Person A's conduct constituted extortion and that the conduct was a felony.  Despite this knowledge, defendant PETERS failed to report this crime to any law enforcement authority.  Instead, defendant PETERS acted affirmatively to conceal the extortion, as well as the underlying collusion that she had threatened to reveal, including by instructing Kiesel to obtain a confidentiality agreement.

**E.    MAY 2019: DEFENDANT PETERS CONTINUES TO CONCEAL PERSON A'S EXTORTION OF KIESEL IN RESPONSE TO INQUIRIES BY THE CITY**

31.  During late April and early May of 2019, PwC deposed multiple current and former attorneys for the City, including defendant PETERS and Kiesel, in an effort to learn more about the collusion between the City and Ohio Attorney in *Jones v. City*, which by then had been revealed.  By that time, defendant PETERS was no

Defendant's Initials: _____     11

longer employed by the City Attorney's Office, and he was represented by a personal attorney.

32.  On or about May 6, 2019, the City Attorney's Office inquired of defendant PETERS (through respective counsel) what defendant PETERS recalled about a dispute that Kiesel had negotiated at LADWP headquarters in 2017.  Defendant PETERS understood that the inquiry about this long-ago "settlement" related to Kiesel's payment of Person A's extortionate demands to conceal the City's collusion. Defendant PETERS further understood that the inquiry was intended to determine whether defendant PETERS would reveal, if asked by someone outside the City, the extortion scheme or the underlying collusion that was concealed by the extortion scheme.

33.  In order to convey that he would continue to conceal his knowledge of Person A's extortion of Kiesel and the City Attorney's Office's role in it, defendant PETERS falsely and misleadingly replied to the City through his personal attorney that the dispute had involved only an employment claim by Person A.  Defendant PETERS intentionally omitted: (1) that Person A had threatened to reveal the Sensitive Documents exposing the undisclosed collusion unless Kiesel satisfied her demands, which Kiesel had ultimately done by paying Person A $800,000 to obtain the return of the Sensitive Documents; (2) that defendant PETERS had directed Kiesel to satisfy Person A's demands or be fired from Kiesel's role as Special Counsel; and (3) that defendant PETERS had discussed the situation with and received direction from senior members of the City Attorney's Office.

34.  By his false and misleading reply to the City's inquiry, defendant PETERS again acted affirmatively to conceal Person A's extortion, as well as the underlying undisclosed collusion.

Defendant's Initials: _____        12